# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

QUICKSILVER RESOURCES, INC.,       §
                             §
          *Plaintiff*,         §
                             §
v.                                §       CIVIL ACTION H-08-868
                             §
EAGLE DRILLING, L.L.C.,         §
                             §
          *Defendant*.       §

## ORDER

Pending before the court are three motions for summary judgment: Eagle Drilling, L.L.C.'s motion for partial summary judgment on Quicksilver Resources, Inc.'s action for breach of contract (Dkt. 85); Eagle Drilling, L.L.C.'s motion for partial summary judgment on Quicksilver Resources, Inc.'s claims of fraudulent inducement and negligence (Dkt. 96); and Quicksilver Resources, Inc.'s motion for summary judgment as to Eagle Drilling, L.L.C.'s counterclaim seeking recovery of attorneys' fees (Dkt. 84).

Having reviewed the motions, responses, replies, relevant portions of the record, and applicable law, the court DENIES Eagle Drilling, L.L.C.'s motion for summary judgment on Quicksilver Resources, Inc.'s breach of contract action (Dkt. 96); DENIES Eagle Drilling, L.L.C.'s motion for partial summary judgment on Quicksilver Resources, Inc.'s claims of fraudulent inducement and negligence (Dkt. 85); and DENIES Quicksilver Resources, Inc.'s motion for summary judgment as to Eagle Drilling L.L.C.'s counterclaim for attorneys' fees (Dkt. 84).

## I. BACKGROUND

This court has, on several occasions, detailed the factual and procedural history of the instant

case. Rather than reiterate the facts and procedural history extensively, the court briefly summarizes them as follows.

On March 8, 2006, Quicksilver Resource, Inc. ("Quicksilver") and Eagle Drilling, L.L.C. ("Eagle") entered into three International Association of Drilling Contractors daywork drilling contracts ("IADC Contract(s)") covering Rigs Fourteen, Fifteen, and Sixteen under which Eagle was to perform drilling services for Quicksilver in connection with their natural gas exploration and production operations in Texas. Eagle was to assemble each of the three rigs and commence drilling operations on July 20, 2006, for Rig Fourteen, October 20, 2006, for Rig Fifteen, and January 20, 2007, for Rig Sixteen. Dkt. 85. In May 2006, at the request of Quicksilver, Eagle delivered Rig Sixteen out of order and commenced drilling services owed under the Rig Sixteen IADC Contract. *Id.* Consequently, and by agreement of the parties, Rig Fourteen became due on Rig Sixteen's originally expected commencement date of January 20, 2007. Dkt. 15, Ex. A-4.

Rig Sixteen commenced operations in June 2006, at which time maintenance issues occurred and the longer than average drilling times were experienced. Dkts. 85; 91, Exs. D-1, D-2. In late July of 2006, Rig Sixteen moved to the Nessie #1H location, where performance purportedly worsened. Dkt. 91, Exs. A-3, D-1.

On August 25, 2006, Eagle assigned the IADC Contracts to Eagle Domestic Drilling Operations, L.L.C. ("EDDO"). Dkt. 44. Three days later, Rodney Thorton, on behalf of Eagle, notified Quicksilver in writing that the IADC Contracts had been assigned. Dkt. 23, Ex. B. On September 13, 2006, after experiencing mechanical problems with Rig Sixteen, Quicksilver contacted Blast Energy Services ("Blast"), EDDO's parent company, to express its concern about EDDO's future operations of Rigs Fourteen and Fifteen. Dkt. 13, Ex. 4. On October 4, 2006, Quicksilver communicated to EDDO that it would accept delivery of Rigs Fourteen and Fifteen if

2

EDDO could provide assurances that the rigs would be in compliance with the IADC Contracts. Dkt. 13, Ex. 4.  Quicksilver also requested the opportunity to have the rigs inspected by a certified inspector prior to delivery.  Although EDDO invited Quicksilver to inspect the rigs at any time, Quicksilver never sent an inspector.  *Id.*  Shortly after October 4, 2006, Quicksilver learned that Rig Fourteen was equipped with a Chinese replica of a Lee C. Moore derrick, not an authentic Lee C. Moore derrick as required by the IADC Contract.  Dkts. 12, Ex. C; 85.

Thereafter, Quicksilver filed the current action against EDDO and Eagle on October 13, 2006, in the 342nd Judicial District of Tarrant County, Texas, alleging negligence and breach of the IADC Contracts.  Dkt. 20, Ex. 10.  On December 18, 2006, Eagle filed its answer and a motion to dismiss the Tarrant County action.  Dkt. 20, Ex. 12.  In January 2007, EDDO filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court for the Southern District of Texas, Houston Division ("Southern District Bankruptcy Court").  Dkt. 18.  Quicksilver then removed the instant action against EDDO and Eagle from Tarrant County to the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division ("Northern District Bankruptcy Court") on February 27, 2007.  Dkt. 24.  EDDO then filed a motion in the Northern District Bankruptcy Court to transfer venue to the Southern District Bankruptcy Court.  Dkt. 26, Ex. 4.  The Northen District Bankruptcy Court granted EDDO's motion, and the case was transferred to the Southern District Bankruptcy Court on May 30, 2007.  Dkt. 26, Ex. 4. In the Southern District Bankruptcy Court, Eagle filed a motion to dismiss for failure to state a claim or, in the alternative, a motion to sever Eagle.  *Id.*  The court denied Eagle's motion on August 1, 2007.  *Id.*

On September 20, 2007, Eagle filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Oklahoma

("Oklahoma Bankruptcy Court"), which automatically stayed any further proceedings against Eagle in this lawsuit. *Id.* Quicksilver then petitioned the Oklahoma Bankruptcy Court for relief from the stay. *Id.* The court granted Quicksilver's motion and allowed the litigation to continue in the Southern District Bankruptcy Court. Dkt. 26, Ex. 8. Subsequently, the Southern District Bankruptcy Court confirmed Eagle and Blast's plan of reorganization. Consequently, Eagle filed a motion to withdraw the reference. *Id.* On March 7, 2008, Bankruptcy Judge Bohm recommended withdrawing the reference of this adversary proceeding. Dkt. 1. This court adopted his recommendation and withdrew the reference pursuant to an order entered on May 13, 2008. Dkt. 9.

Quicksilver moved for partial summary judgment, asking the court to find that EDDO and/or Eagle materially breached the Rig Fourteen IADC Contract and to declare the contract void. Dk. 12. On May 20, 2008, Eagle filed a motion to transfer venue to the District Court for the Western District of Oklahoma or, in the alternative, to dismiss the case. Dkt. 18. On May 27, 2008, EDDO moved for partial summary judgment asking the court to declare that Eagle's assignment of their rights and obligations under the IADC Contracts to EDDO in August 2006 was valid. Dkt. 23. On August 4, 2008, this court denied Quicksilver's motion for partial summary judgment and Eagle's motions to transfer venue and dismiss, and granted EDDO's motion for partial summary judgment, finding that Eagle's assignment to EDDO was valid. Dkt. 44.

In October 2008, Quicksilver and EDDO filed an agreed motion to dismiss with prejudice and stipulation as to the claims between Quicksilver and EDDO, which was granted by this court. Dkts. 72–74. Accordingly, the scheduling order was revised, and the remaining parties were ordered to amend all motions for summary judgment, which are now pending before the court. Specifically, Eagle filed a motion for summary judgment regarding Quicksilver's claims of breach of contract

4

(Dkt. 85), negligence, and fraudulent inducement (Dkt. 96), and Quicksilver filed a motion for summary judgment with respect to Eagle's counterclaim for attorneys' fees (Dkt. 84).

## II. ANALYSIS

### A. Summary Judgment Standard

Although the parties concur that the substantive law of Oklahoma governs resolution of the dispute, summary judgment is procedural and, therefore, is governed by the Federal Rules of Civil Procedure. Thus, the Fifth Circuit summary judgment standard applies, notwithstanding the court's observation that the Fifth and Tenth Circuit standards are largely congruent.

A timely motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). Upon a defendant's motion for summary judgment, the plaintiff "must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." FED. R. CIV. P. 56(e). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett* , 477 U.S.

317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden

does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material

fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary

judgment, and no defense to the motion is required.  *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the

movant may merely point to the absence of evidence and thereby shift to the non-movant the burden

of demonstrating by competent summary judgment proof that there is an issue of material fact

warranting trial." *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also*

*Celotex*, 477 U.S. at 323–25.  To prevent summary judgment, "the non-moving party must come

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus.*

*Co.*, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the

light most favorable to the non-movant and draw all justifiable inferences in favor of the non-

movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The

court must review all of the evidence in the record, but make no credibility determinations or weigh

any evidence; disregard all evidence favorable to the moving party that the jury is not required to

believe; and give credence to the evidence favoring the non moving party as well as to the evidence

supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch.*

*Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the nonmovant cannot avoid summary judgment

simply by presenting "conclusory allegations and denials, speculation, improbable inferences,

unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of*

*Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075

(5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof

based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## B. Limitations on Consequential Damages

### 1. Applicable Standards

#### a. Waiver[1]

"Waiver is the voluntary and intentional relinquishment of a known right," and can be either express or implied. *Barringer v. Baptist Healthcare of Okla.,* 22 P.3d 695, 700–01 (Okla. 2001). "Except in the case of certain public service contracts, the contracting parties can by agreement limit their liability in damages to a specified amount, either at the time of making their principal contract, or subsequently thereto." RESTATEMENT (FIRST) OF CONTRACTS § 339 cmt. g. (quoted in *Fretwell v. Protection Alarm Co.*, 764 P.2d 149, 152 (Okla. 1998)). Likewise, parties may contractually limit liability for consequential damages. *See, e.g.*, *Dollar Rent A Car Systems, Inc. v. P.R.P. Enters., Inc.*, No. 01-cv-698 JHP FHM, 2006 WL 1266515, at *27 (N.D. Okla. May 8, 2006) (citing numerous cases in support of the proposition). Moreover, if a contract is the basis for the relationship giving rise to an alleged tort, "any lawful limitations in the contract may also limit the liability of the tortfeasor." *Fretwell*, 764 P.2d at 151. "[W]hen the facts are not disputed and are subject to only one interpretation, the question of waiver becomes one of law to be decided by the court." *Barringer*, 22 P.3d at 701.

#### b. Contract Interpretation

"Construction of an unambiguous contract is a matter of law." *Cook v. Okla. Bd. of Public Affairs*, 736 P.2d 140, 145 (Okla. 1987). "The language of a contract is to govern its interpretation,

---

[1] Although Eagle cited and applied the standard for unconscionability, found in the UCC, in analyzing the waiver, Eagle has also explicitly stated that the "UCC does not apply." Dkt. 29 Regardless, analysis under the UCC would yield the same result in the instant case.

if the language is clear and explicit, and does not involve an absurdity." OKLA. STAT. tit. 15, § 154.

"Where a contract is complete in and of itself and is unambiguous, the contract's language is the only

legitimate evidence of the parties' intent." *Cook*, 736 P.2d at 147. "However broad may be the

terms of a contract, it extends only to those things concerning which it appears that the parties

intended to contract." OKLA. STAT. tit. 15, § 164. "Even though the result may be harsh, a party will

be bound by the unambiguous terms of a contract." *Id.*

**2. As Applied**

*a. Validity of Waiver*

After reviewing the circumstances under which the contract was executed and the nature of

the waiver and agreement, the court finds that the waiver of consequential damages is valid.

Consequential damages are a known remedy for breach of contract. RESTATEMENT (SECOND)

CONTRACTS § 347 cmts. a, c (describing remedies and explaining that contract damages are

ordinarily derived from the party's expectation interest, *i.e.* benefit of the bargain, whereas

consequential or indirect damages result from the defective performance). Admittedly, both parties

are sophisticated business entities. Specifically, Quicksilver is a publicly traded oil and gas company

with nearly $5 billion in assets as of September 2008. Dkt. 85, Ex. L. And, in the IADC contracts,

Quicksilver acknowledges that it is a "sophisticated oil and gas operator" that understands the nature

of such agreements. Dkt. 85, Ex. B. Although Jeff Cook indicates that little negotiation occurred

prior to entering into the agreements (Dkt. 96, Ex. 1-D), some differential in bargaining position does

not preclude a finding that the waiver is valid; absolute equality is not required. And, the contracts

do contain some provisions on which Quicksilver insisted—for example, the requirement that a Lee

C. Moore derrick be used. The court's conclusion is further bolstered by the fact that waiver

provision is mutual. Dkt. 85, Ex. B ("[E]ach party shall at all times be responsible for and hold

harmless and indemnify the other party from and against its own special, indirect, or consequential damages . . . .").

Moreover, throughout the agreement, the waiver provision's existence is prominently emphasized, implying that there was no deception in its inclusion.  For example, at the top of the first page, the contract states, in all capital letters: "THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK—SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14."  And, just prior to the signature lines, the contract reiterates: "The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 6.3(c), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by [Quicksilver and Eagle]."

Ultimately, the language of the agreement is clear, and the parties have not suggested that either party intended any interpretation contrary to this plain meaning.

*b. Scope of Waiver*

In the IADC contracts, the parties explicitly agreed to a spectacularly broad waiver of consequential damages.  However, the provision is not "broad" in a general, ambiguous sense.  Rather, the provision is broad because of the volume and nature of the waivers and definitions contained therein.  The clause primarily at issue, subparagraph 14.12, reads:

> Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect, or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims,

demands, and causes of action of every kind and character in connection with such special, indirect  or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners, and joint owners.

Dkt. 85, Ex. B.  Additionally, the IADC contracts contain the following limitation in subparagraph

14.13:

> Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, . . . Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability.  The indemnities, and releases of assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each.

*Id.*

In his deposition testimony, Jeff Cook describes the damages sought by Quicksilver as "$403,000 for third party contractors [Quicksilver] had to keep on location while this rig was broke[n]" and $545,000 in legal fees.  Dkt. 85, Ex. C.  Quicksilver argues that the damages paid to third-party contractors are not encompassed by the waiver, which does not speak to direct damages, and that a question of fact exists as to the nature of the damages.  However, Quicksilver fails to outline its argument as to how the damages paid to third-party contractors could be considered direct damages.

The only case cited by Quicksilver in support of its proposition that the nature of damages is a question of fact, *Penncro Associates, Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007), does not involve the application of Oklahoma law.  Notwithstanding this legal

distinction, the *Penncro* court addressed whether a provision stating that no consequential damages, "includ[ing], but . . . not limited to, lost profits," were recoverable precluded a finding that some lost profits might be recoverable as direct damages. *Penncro Associates, Inc.*, 499 F.3d at 1155. The *Penncro* court acknowledged that "parties are free to diverge from linguistic and legal norms and to define terms in their contracts as they see fit," but the parties must manifest a clear intent to modify the common usage. *Id.* at 1157. The *Penncro* court found that, based on the language in the agreement, the parties intended to limit lost profits as merely *one type of* consequential damage in an illustrative list. Lost profits were not singled out as a distinct type of damage and, thus, not precluded from recovery in their entirety, *i.e.* if it was shown that they were a direct damage.

The instant case is also factually distinguishable because, rather than limiting consequential damages by stating that they "include[ ], but *[are] not limited to*" lost profits, here, in subparagraph 14.12, the "parties [have] agreed that special, indirect or consequential damages shall be deemed to include, *without limitation*, . . . loss of profit or revenue; . . . [and] cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties." Dkt. 85, Ex. B. Thus, the agreement manifests a clear intent by the parties to modify the legal meaning and breadth of the term "consequential damages." While the clause in *Penncro* implies that other, unlisted, damages also might be considered consequential damages, subparagraph 14.12 states that the listed damages are to be considered special, indirect, or consequential "without limitation." Accordingly, the specifically enumerated types of damages are barred from recovery. And, per the subsequent clause, subparagraph 14.13, the specifically enumerated damages are not recoverable regardless of the cause of action in which they are sought. *See* Dkt. 85, Ex. B (specifically citing breach of contract and breach of duty, including negligence).

Even if the damages paid to the third-party contractors were not "traditionally" within the realm of consequential damages, or could have been classified as direct damages,[2] the parties have nonetheless defined them as consequential damages—without limitation.

Having reviewed the phraseology and nature of clause at issue, the circumstances surrounding their execution, and the relative positions of the parties, the court concludes that the damages waiver is valid and enforceable.  And, despite the "harsh" result, the parties are bound by the unambiguous terms of their agreement: recovery of the sums paid to third- party contractors are not recoverable under the contract because they constitute consequential damages, as defined by the parties.  However, the parties have not waived liability entirely.  Neither direct nor nominal damages have been waived, and neither party has made that argument.  Therefore, the court examines the impact of the waiver on the claims at issue in the pending motions for summary judgment.

**B. Eagle's Motion for Summary Judgment on Quicksilver's Breach of Contract Claims**

"A breach of contract suit requires three elements be proven: formation of a contract; a breach of that contract; and actual damages suffered from that breach."  *Oltman Homes, Inc. v. Mirkes*, 190 P.3d 1182, 1185 (Okla. Civ. App. 2008).

Because the parties do not dispute the existence of a contract,[3] the court focuses on the elements of breach and damages.  Eagle primarily argues that it was released of its obligations under the contract and, therefore, is not in breach, because it assigned its obligations to EDDO on August

---

[2] The deposition testimony of Jeff Cook indicates that the damages, the sums paid to third parties, were incurred as the result of the defective or broken equipment.  Presumably, such damages would be the result of defective performance, and likely constitute consequential damages within the traditional meaning of the term.  As noted previously, Quicksilver has not argued how these particular damages could be considered "direct" in nature, *i.e.* how they were part of Quicksilver's expectation interest or constituted the benefit of the bargain.

[3] Although a claim of fraudulent inducement is raised, "where a contract is entered into on the basis of a misrepresentation which goes to the contract's *inducement,* as a notion distinct from its nature, the tainted agreement is rendered merely *voidable*."  *Harkrider v. Posey*, 24 P.3d 821, 827 (Okla. 2000).  "A contract voidable for fraud in the inducement creates a valid contractual relationship, which subsists in contemplation of law until the parties are relieved of their obligation by a decree of rescission."  *Id.*

25, 2006.  Dkts. 44, 85.  Further, Eagle maintains that the Nessie #1H well, drilled by Rig Sixteen, substantially performed under the contract by drilling to the target depth.  In support of its position, Eagle cites to dicta in a prior opinion of this court, proclaiming it to be the law of the case.  *See* Dkt. 44.

### 1. Breach of Contract

Substantial performance is required to preclude a finding of breach of contract.

Substantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered . . . .  As the courts have stated: "A breach of contract is not material if substantial performance has been rendered."  The question of the materiality of the breach normally is one of fact.

15 WILLISTON ON CONTRACTS § 44:55 (4th ed.) (internal footnotes omitted).

### a. Post-Assignment Breach

At the time the IADC contracts were validly assigned to EDDO on August 25, 2008, Rig Sixteen was on location at Nessie #1H.  Eagle argues that it is released of any further obligation to Quicksilver as of the date of assignment; however, the court notes the important distinction between "assignment" and "novation."  Relatively recently, the Northern District of Oklahoma cited the Oklahoma Supreme Court, which recognized "the hornbook rule that delegation of performance of a contract does not discharge the liability of the delegating obligor."[4]  *Oral Roberts Univ. v. Anderson*, 11 F. Supp. 2d 1336, 1339 (N.D. Okla. 1997) (citing *Walker v. Mills*, 78 P.2d 697, 699 (Okla. 1938)).  "It is stated as a general rule that 'a party to a contract may not, unless authorized by the other party, either in the contract itself of otherwise, so assign the contract as to escape liability

---

[4] In *Oral Roberts University*, the court clarified that the term "delegation" pertains to duties, whereas "assignment" relates to rights.  *Oral Roberts Univ.*, 11 F. Supp. 2d at 1339.  But, because the parties have referred to the assignment of the IADC contracts as "assignments," we retain the same terminology.

13

for the performance of the acts or duties imposed upon him by its terms,' but the assignor remains liable to the other party for the proper performance by his assignee." *Walker*, 78 P.2d at 699 (quoting American Jurisprudence and Corpus Juris Secundum).

In contrast to an assignment, "[a] novation discharges the original duty, just as any other substituted contract does, so that a breach of the new duty gives no right of action on the old duty." RESTATEMENT (SECOND) OF CONTRACTS § 280 cmt. b. The essential elements of a novation include: "(1) a previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the extinguishment of the old contract; and (4) the validity of the new one." *Lincoln Nat. Life Ins. Co. v. Rider*, 42 P.2d 842, 843 (Okla. 1935) (internal quotations omitted).

Assuming *arguendo* that the novation concept applies to the instant case and that the requirements of a novation are not met, Eagle may be liable for any breaches of the contract occurring after the assignment, including, but not limited to, performance of the rig and the substitution of the Chinese derrick for the contractually specified Lee C. Moore derrick. However, the parties did not raise or brief this issue.

*a. Pre-Assignment Breach*

Even if the novation concept is inapplicable to the case at bar, several incidents occurring prior to the assignment could give rise to a conclusion that the contract was breached before August 25, 2006. First, as this court noted in ruling on the validity of the assignment, the contract required advance notice of assignment, which clearly was not provided to Quicksilver. *See* Dkts. 23, Ex. B (noting that Eagle notified Quicksilver on August 28, 2006); 44.

Also, the contract specifically required Eagle to "provide a rig that met industry standards and performed in a good and workmanlike manner." However, the record indicates that problems with the performance of Rig Sixteen began as early as June and July of 2006. Dkts. 85, Exs. G

14

(email from Dennis Barrett to Rod and Rick Thornton, identifying thirteen potential issues), H (email from Jeff Cook to Rod Thornton, stating "We have been 58 days on location with this rig and we aren't close to being finished.  It is taking us about 20 days average to finish a well with other rigs. I don't think any judge in the country would uphold our contract with this kind of performance.");[5] 91, Exs. A-3 (reflecting drawworks failure on Nessie #1H on August 21, 2006), D-1, D-2 (depositions of Tommy Williams and Loye "Butch" Swinney, describing longer than average drill times and downtime in excess of four hundred hours), D-5 (deposition of James Marshall, characterizing the problems on Mastershake #1H as "teething problems" and those on Nessie #1H as a "major breakdown").  Additionally, the summary judgment evidence suggests that parts of the rig were not in the condition promised by Eagle soon after Rig Sixteen began drilling.  Dkt. 91, Ex. A (noting defects with the swivel, bolts that were rusted and in poor condition, tong sets that did not fit or work as designed, jaws on the rotary locks that were worn and ineffective, valves in working pits that were defective, and centrifugal mixing pumps that leaked and were in need of repair).

Finally, despite Eagle's attempt to cast the court's prior statement that the target depth was reached as the law of the case, to do so would be improper.  "The law of the case doctrine is procedural." *Halliburton Energy Services, Inc. v. NL Industries*, 553 F. Supp. 2d 733, 778 (S.D. Tex. 2008).  Further the rule is discretionary, not jurisdictional; it "merely expresses the practice of courts generally to refuse to open what has been decided," and is not a limit of their power.  *United States v. Cisneros*, 456 F. Supp. 2d 826, 851–52 (S.D. Tex. 2006) (citing *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002)).  Courts should, however, be reluctant to revisit prior decisions absent extraordinary circumstances, which include: (1) "evidence on a subsequent trial is substantially

---

[5] However, subsequent correspondence indicates that Jeff Cook's email may have been based on faulty information.  Dkt. 85, Ex. H.

different"; (2) "controlling authority has since made a contrary decision of the law applicable to such issues"; or (3) "the decision is clearly erroneous and will work a manifest injustice." *Id.*

Here, the court's statement that the target depth was reached was not a holding of the court, nor was it necessary to the court's holding in the prior order, which primarily addressed the validity of the assignment to EDDO. *See* Dkt. 44. Further, the summary judgment evidence presents a more complete picture of the events as they unfolded.

On review of the summary judgment record, Rig Sixteen may have stopped drilling the Nessie #1H well before reaching the target depth. The contract for Rig Sixteen specified a target range of "approximately 10,000 feet, or to the formation, whichever is deeper, but . . . not . . . below a maximum depth of 11,000 feet," but neither party provided evidence of the depth of the top of the Barnett Shale (the relevant formation) in the well. Dkt. 85, Exs. B, C (deposition of Jeff Cook, indicating that the basic depth of the Barnett Shale in Bosque County is "all over the place"). It is largely undisputed that drilling ceased near 8,000 feet, potentially 2,000 feet from the minimum target depth specified in the contract.

 Deposition testimony and sworn statements indicate that the target depth was not reached. Dkt. 85, Ex. C (deposition of Jeff Cook); 91, Ex. B (affidavit of Dennis Barrett). But, other evidence suggests that the original target depth in the contract was reduced to the actual target depth reached. Dkt. 91, Ex. C. (deposition of Tommy Williams, reflecting that the target depth was modified to 8,030 feet). The reason for the decrease in the target depth, *e.g.* whether it related to the depth of the top of the formation or resulted from maintenance problems, is unclear. *Id.*

Whether the failure to notify of assignment, performance issues, or other activities not specifically addressed, individually or collectively, constitute a material breach is a question of fact, properly addressed by the finder of fact at trial.

*2. Damages*

Although the court concluded above that Quicksilver waived its right to obtain consequential damages, which include the sums paid to third-party contractors, the waiver does not automatically destroy the cause of action.  Breach alone may be sufficient for an award of nominal damages.  In particular, the Restatement (Second) of Contracts, provisions of which have been  favorably cited by Oklahoma courts, states:

> Although a breach of contract by a party against whom it is enforceable always gives rise to a claim for damages, there are instances in which the breach causes no loss. . . .  There are also instances in which loss is caused but recovery for that loss is precluded because it cannot be proved with reasonable certainty or because of one of the other limitations stated in this Chapter. . . .  In all these instances the injured party will nevertheless get judgment for nominal damages, a small sum usually fixed by judicial practice in the jurisdiction in which the action in brought.  Such a judgment may, in the discretion of the court, carry with it an award of court costs.

RESTATEMENT (SECOND) OF CONTRACTS § 346.  Williston on Contracts is in accord:

> An unexcused failure to perform a contract is a legal wrong.  An action will therefore lie for the breach although it causes no injury.  Nominal damages may then be awarded.  The same result follows where the actual injury, although real and perhaps serious, cannot be measured under the rules requiring that harm caused shall be foreseeable and not speculative.

24 WILLISTON ON CONTRACTS § 64:6 (4th ed.) (internal footnote omitted).

However, Oklahoma case law implies that the existence of actual damages is an element of a cause of action for breach of contract.  Yet, an Oklahoma statute provides: "When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages." OKLA. STAT. tit. 23, § 98.  Indeed, the court in *Gourley v. Lookabaugh*, 149 P. 1169, 1170 (Okla. 1915), implied that the determination of what showing of damages would permit recovery may not be straightforward.  The *Gourley* court left the door open to the possibility that no actual damages need be shown.  Thus, the statute may be drawing a distinction between those damages incurred, but

too speculative or difficult to measure to recover, as compared circumstances in which no injury occurs in fact.  But, the court does not reach this issue because the parties did not raise or brief their respective positions on the availability of nominal damages, which may be particularly relevant here because of the impact on the award of attorneys' fees to a "prevailing party."

Additionally, while it may seem a fine distinction, the ability to recover damages sustained and whether damages have actually been sustained are two different things.  Although the parties waived the right to recover consequential damages, it does not necessarily follow that no damages were incurred.  But, the parties have not raised or briefed the distinction, specifically.

Because of the numerous issues remaining, the court cannot rule as a matter of law. Therefore, the court DENIES Eagle's motion for summary judgment on Quicksilver's breach of contract claim.  Dkt. 85.

## C. Eagle's Motion for Summary Judgment on Quicksilver's Negligence and Fraudulent Inducement Claims

### 1. Negligence

"Under Oklahoma law, to establish a claim based on negligence, the plaintiff must establish (a) the existence of a duty owed by defendant to plaintiff; (b) that the defendant failed to perform that duty; and (c) that the defendant's failure caused the plaintiff injury."  *Woolard v. JLG Industries, Inc.*, 210 F.3d 1158, 1168 (10th Cir. 2000).

Like the breach of contract claims, Eagle relies primarily on the assignment of the  contracts to EDDO to release it of liability for negligence.  Eagle also maintains that the waiver of damages leaves Quicksilver without injury, thereby destroying the cause of action.

*a. Duty*

The Oklahoma Supreme Court has held that:

Although torts may be committed by parties to a contract, a tort is a violation of a duty imposed by law independent of contract. . . .  A common law duty to perform with care, skill, reasonable expediency, and faithfulness accompanies every contract.  Negligent failure to observe any of these conditions will give rise to an action *ex delicto* as well as an action *ex contractu.*

*Milroy v. Allstate Ins. Co.*, 151 P.3d 922, 926–27 (Okla. Civ. App. 2006) (quoting *Lewis v. Farmers Ins. Co.*, 681 P.2d 67, 69 (Okla. 1983) (footnote omitted)); *see also Cook*, 736 P.2d at 154.  Thus, "Oklahoma law provides that a tort may arise in the course of performance of a contract and that tort may then be the basis for recovery even though it is the contract that creates the relationship between the parties."  *Woolard*, 210 F.3d at 1168.  "[It] is well-established that,  where a breach of contract is permeated with tort, the injured person may elect to waive the contract and recover in tort; or, differently stated, although the relation between the parties may have been established by contract, express or implied, if the law imposes certain duties because of the existence of that relation, the contract obligation may be waived and an action in tort maintained for the violation of such imposed duties."  *Id.* (quoting *Hall Jones Oil Corp. v. Claro*, 459 P.2d 858, 861 (Okla. 1969)) (internal quotation omitted) (alteration in original).  Thus, at the very least, a common law duty was imposed by virtue of the contractual relationship between the parties.

*b. Breach of Duty*

"With respect to the skill required of a person who is to render services, it is a well-settled rule that the standard of comparison or test of efficiency is that degree of skill, efficiency, and knowledge which is possessed by those of ordinary skill, competency, and standing in the particular trade or business for which he is employed, or . . . 'such care and skill as a reasonably competent and

skillful person should have exercised in the performance of his contractual obligation.'" *Keel v. Titan Const. Corp.*, 639 P.2d 1228, 1231 (Okl. 1981) (internal footnote and citation omitted).

While the record reflects Quicksilver's awareness of the difficulties of drilling, and despite Eagle's protestations that flawless performance was not guaranteed, there is also evidence to suggest that performance under the contract fell below industry standards.  Dkts. 85, Ex. B; 96.  The evidence supporting such a view, primarily that related to rig performance and quality, was addressed with respect to the breach of contract claim.

Additionally, whether the repair efforts, which began prior to assignment, met industry standards is questionable.  Eagle also allegedly contributed to the ultimate recommendation of bolting the clutch to address the problems with the drawworks.  Bolting the clutch purportedly results in slower drilling, increased costs, and potential damage to the hole.  Dkt. 91, Ex. D-5 (deposition of James Marshall).  Further, some of the deposition testimony suggests that bolting the clutch is an emergency procedure, rather than a permanent solution, and may expose rig workers to safety risks. Dkt. 91, Ex. D-2 (deposition of Loye "Butch" Swinney).

Whether these actions rise to the standard of the "degree of skill, efficiency, and knowledge which is possessed by those of ordinary skill, competency, and standing in the particular trade or business for which he is employed, or . . . 'such care and skill as a reasonably competent and skillful person should have exercised in the performance of his contractual obligation'" cannot be determined as a matter of law based on the record currently before the court.  *See Keel*, 639 P.2d at 1231.

*c. Causation of Damages*

After establishing the duty and standard by which the alleged tortfeasor is to be judged, the plaintiff must then demonstrate that the purported breach proximately caused the plaintiff's injury.

The requirement that before one may become liable for his tortious injury to another, the injury complained of must have been reasonably foreseeable to the tortfeasor is firmly ensconced in the Oklahoma law.  And, as [the Oklahoma Supreme Court] said in *Atherton v. Devine*, [602 P.2d 634 (Okla. 1979)]: "Causation traditionally lies within the realm of fact, not law.  In an action for injuries caused by the defendant's negligence, it is a jury question whether the injurious consequences resulting from the negligence could have reasonably been foreseen or anticipated. . . . Foreseeableness becomes a question of law for the court only when one reasonable conclusion can be drawn from the facts."

*Keel*, 639 P.2d at 1232; *see also* OKLA. STAT. tit. 23, § 61 ("For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not."

Actual injury or damage is a component of a cause of action for negligence.  *See Kernodle v. Elder*, 102 P. 138, 140 (Okla. 1909) ("Mere lack of skill, or negligence, not causing injury, gives no right of action, and no right to recover even nominal damages.") (addressing nominal damages in context of medical malpractice claim); *see also* RESTATEMENT (SECOND) TORTS § 907, cmt. a ("If actual damage is necessary to a cause of action, as in negligence, nominal damages are not awarded.").  As discussed above, with respect to the breach of contract claim, waiving the ability to recover damages does not necessarily equate to having suffered no damage.  Assuming *arguendo* that the waived damages would constitute actual damages or injury, the plaintiff may be entitled to nominal damages.

Eagle also argues that the economic loss rule bars recovery of tort damages in the instant case.  Dkt. 96.  In its broadest sense, the economic loss rule precludes recovery of  consequential losses, sounding in contract, absent personal injury or property damage.  The economic loss doctrine is most commonly associated with products liability claims; however, some jurisdictions apply the limitation on recovery outside of that realm.  *See* 63B AM. JUR. PRODUCTS LIABILITY § 1914 ("Recovery of purely economic loss in negligence actions based on alleged products defects is

limited by the economic loss rule in most jurisdictions."); *see also* 5 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., CONSTRUCTION LAW §17:90 ("Other jurisdictions have applied the economic loss rule to construction services.").

The case law is murky, but, where the UCC governs, a negligence claim does not lie. Rather, the UCC provisions provide the plaintiff with an appropriate remedy. *Fintube Technologies, Inc. v. Tubetech North America, Inc.*, No. 05-cv-56-JHP FHM, 2006 WL 1266487, at *5 (N.D. Okla. May 5, 2006)[6]; *see also United Golf, L.L.C. v. Westlake Chemical Corp.*, No. , 2006 WL 2807342, at * 2 (N.D. Okla. Aug. 15, 2006) ("Oklahoma recognizes the economic loss rule, which provides that a manufacturers' [sic] products liability claim is not available 'for injury only to the product itself resulting in purely economic loss.' *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 653 (Okla. 1990). The reasoning of *Waggoner* applies to the full range of unintentional torts, precluding negligence *or* products liability claims when the UCC provides a comprehensive remedy for plaintiff's economic injury." (emphasis added)). Here, however, Eagle has stated explicitly that the UCC does not apply. And, the only law Eagle cites in support of its argument involves products liability claims, which Quicksilver maintains are not asserted in the instant case.

Again, the existence of genuine issues of material fact preclude the award of summary judgment. Accordingly, Eagle's motion for summary judgment on Quicksilver's negligence claim (Dkt. 96) is DENIED.

### 2. Fraudulent Inducement

"Actionable fraud is composed of the following elements: (1) a false misrepresentation of a material fact, (2) made as a positive assertion either known to be false or recklessly made without

---

[6] Like the instant case, *Fintube* involved a claim for negligence under the theory that defendant's failure to execute the contract with care, skill, reasonable experience and faithfulness, and in a workmanlike manner constituted a breach of the duty implied in every contract for services in Oklahoma.

knowledge of the truth, (3) made with the intention of causing the other party to act, and (4) which is relied on by the other party to his or her own detriment." *Gish v. ECI Servs of Okla., Inc.*, 162 P.3d 223, 228 (Okla. Civ. App. 2006). Eagle maintains that Quicksilver cannot show that Eagle made the allegedly false statements at issue, with knowledge that they were false. Further, Eagle argues that the merger clause in the contract prevents Quicksilver from putting forth any evidence of precontractual promises in support of its claim.

*a. False Representation of Material Fact, Known to be False or Recklessly Made*

>       Although fraud cannot be presumed, circumstantial evidence may be used to prove its occurrence.

*Id.*.

>       Indeed, from its nature it is difficult to prove it by direct evidence, and it is seldom that it can be so proved. Hence it is more often shown by circumstances than in any other way. It is impossible, however, to enumerate the facts from which it may be inferred. Each case must depend on its own facts, and all the facts and circumstances, connected with and surrounding the transaction are to be considered together in determining whether it was fraudulent. Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered in connection with each other. It has been said that in most cases fraud can be made out only by a concentration of circumstances, many of which in themselves amount to very little, but in connection with others make a strong case.

*Sellers v. Sellers*, 428 P.2d 230, 238–39 (Okla. 1967). Pre-contractual promises and assurances may be introduced as evidence of fraud in the inducement. *Gish*, 162 P.3d at 232. "It is well-established in Oklahoma that the parol evidence rule does not preclude evidence of false and fraudulent representations of fact offered to establish fraud in the inducement of the execution of a contract, even when those representations directly contradict the contract provisions." *First Nat'l Bank in Durant v. Honey Creek Entm't Corp.*, 54 P.3d 100, 104 (Okla. 2002). Hence, a merger clause will not prevent the presentation of evidence of fraud in the inducement. And, the Oklahoma Supreme Court also has endorsed consideration of events occurring after the alleged fraud, as appropriate

circumstantial evidence of intent.  *Gish*, 162 P.3d at 228.  Ultimately, where evidence is conflicting, "the existence or nonexistence of . . . fraud is a question of fact for the jury."  *Stehm v. Nordam Group, Inc.*, 170 P.3d 546, 550 (Okla. Civ. App. 2007).

Quicksilver maintains that, at the very least, Eagle made several promises to Quicksilver, including: the use of Lee C. Moore derricks; the rigs "would be appropriate to meet Quicksilver's needs to drill horizontal wells in the Barnett Shale"; and Eagle planned to refurbish the parts, repair problems with the rigs, and remove any problematic rigs.  Dkt. 91, Ex. A; *see also* Dkt. 85, Ex. H (email from Jeff Cook to Rod Thornton, stating: "You told me that if we get tired of each other you would take the rigs somewhere else . . . .").

Although Eagle attempts to cast Jeff Cook's statements that little negotiation occurred prior to execution of the contracts as conclusive evidence that no promises or material misrepresentations were made, the attempt falls short and largely distorts the record.  Eagle's portrayal confuses the *substance* of the agreement with the *form* it ultimately takes.  The agreements clearly reflect certain requirements of Quicksilver, notably use of the Lee C. Moore derrick.  Further, Rodney Thornton's deposition testimony contradicts Eagle's position.  Dkt. 97, Ex. D-15 ("There were certain aspects of the contract that Jeff [Cook] and I talked about prior to signing.").

Eagle contends that a physical inspection and appraisal conducted in July 2006 indicate that Rigs Fourteen and Fifteen were equipped with Lee C. Moore derricks.  Dkt. 96, Ex. 1-F.  Thus, Eagle argues that the fact it maintained the Lee C. Moore derricks in inventory supports only one conclusion: that Eagle intended to utilize the Lee C. Moore derrick on the rig.  However, the appraisal cuts both ways.  While it suggests that Eagle did intend to comply, it also raises the question as to why the Lee C. Moore derrick was ultimately replaced with a Chinese derrick,

allegedly post-assignment,[7] despite the contractual terms.  And, although Eagle maintains that the decision to utilize the Chinese derrick was solely that of EDDO, Rodney Thornton's affidavit indicates that some discussion about replacing a derrick on one of the rigs occurred with Quicksilver.

Moreover, as discussed in the breach of contract section, from the alleged condition of the parts on the rig and the performance of the rig, one could infer that Eagle had no intention of delivering on its promises to use refurbished and new parts and properly repair the rig.

Considered in totality, the circumstantial evidence of unkept promises, creates fact issues regarding the promises made to Quicksilver and Eagle's knowledge at the time the promises were made.

*b. Intending to Cause the Other Party to Act*

The parties do not seriously dispute that the alleged promises, if made, were designed to entice Quicksilver to enter into the contracts.  Notably, the Lee C. Moore derrick requirement was incorporated explicitly into the contract.  Dkt. 85, Ex. B.  Further, in his affidavit, Jeff Cook confirms that he "executed the Contracts based upon Eagle's representations."  Dkt. 91, Ex. A.

*c. Detrimental Reliance*

Finally, Eagle contends that Quicksilver cannot prove any damages associated with its reliance on Eagle's alleged promises.  However, a series of emails and the affidavit of Jeff Cook suggest that Quicksilver would not have entered into the contract but for these promises.  *See, e.g.*, Dkt. 85, Ex. M.  Accordingly, Quicksilver seeks rescission of the contract.  Dkt. 97.

Where conflicting evidence exists, the question of fraud is properly determined by the jury. *Practical Prods. Corp. v. Brightmire*, 864 P.2d 330, 331 (Okla. 1992).  And, having determined that

---

[7] As explained with respect to the breach of contract claim, at this point, Eagle's post-assignment liability is unclear.

material issues of fact exist, an award of summary judgment is improper.  Accordingly, Eagle's

motion for summary judgment as to Quicksilver's claim of fraudulent inducement is DENIED.  Dkt.

96.

**D. Quicksilver's Motion for Summary Judgment on Eagle's Counterclaim for Attorneys' Fees**

The IADC contracts contain a provision relating to attorneys' fees, which states that:

> If the Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's [sic] fees and costs.

Dkt. 85, Ex. B.

Because the court concludes that genuine issues of material fact surround Quicksilver's

fraudulent inducement claim, and the contract could be vitiated upon a finding of fraud, a ruling on

the award of attorneys' fees is premature.  The court declines to interpret this particular contract

provision based on hypothetical scenarios; therefore, Quicksilver's motion for partial summary on

Eagle's counterclaim for attorneys' fees is DENIED.  Dkt. 84.

### III. CONCLUSION

Having determined that genuine issues of material fact preclude the award of summary

judgment, the court DENIES Eagle's motion for summary judgment on Quicksilver's breach of

contract action (Dkt. 96); DENIES Eagle's motion for partial summary judgment on Quicksilver's

claims of fraudulent inducement and negligence (Dkt. 85); and DENIES Quicksilver's motion for summary judgment as to Eagle Drilling L.L.C.'s counterclaim for attorneys' fees (Dkt. 84). Accordingly, trial will proceed as scheduled.

Signed at Houston, Texas on May 8, 2009.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY