IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

QUICKSILVER RESOURCES INC.,      §
                                 §
        Plaintiff,               §
                                 §
v.                               §      CIVIL ACTION NO. H-08-0868
                                 §
EAGLE DRILLING, LLC,             §
                                 §
        Defendant.               §

**MEMORANDUM, RECOMMENDATION, AND ORDER**

Pending before the court[1] are Motion for Summary Judgment on Eagle Drilling, LLC's ("Eagle") Contract Claims filed by Quicksilver Resources, Inc., ("Quicksilver"), Glenn Darden, Thomas Darden, and Jeff Cook ("Cook")[2] (Docket Entry No. 164); 2) Motion to Strike Quicksilver's Reply to Eagle's Response filed by Eagle (Docket Entry No. 170); and 3) Motion to Strike the Quicksilver Parties' Reply to Eagle's Sur-reply filed by Eagle (Docket Entry No. 225).[3]

The court has considered the motions, the responses, all other relevant filings, and the applicable law.  For the reasons set

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Docket Entry No. 155.

[2]    For convenience, the court refers to Glenn Darden, Thomas Darden, and Cook as "the individual defendants" and to Quicksilver and the individual defendants as "the Quicksilver parties."

[3]    Also pending are five recently filed motions:  four motions for summary judgment and one motion to exclude (Docket Entry Nos. 235, 236, 238, 239, 240).  The court will consider those when all have been fully briefed.

forth below, the court **RECOMMENDS** that the Quicksilver parties'
summary judgment motion be **GRANTED**.   Both of Eagle's motions to
strike are **DENIED**.

## I.  Case Background

The factual background of this case has been oft-repeated in
opinions, orders, and briefs in the record.   The account here is
taken in large measure from a prior court opinion.[4]

The dispute between these parties has its roots in a
contractual relationship that began in March 2006.   Quicksilver
entered three, nearly identical International Association of
Drilling Contractors Daywork Drilling Contracts ("IADC Contracts")
with Eagle.   Eagle agreed to furnish equipment and labor and to
perform drilling services at a site in north Texas.

All three IADC Contracts explicitly allowed for assignment by
either party "with the prior written notice of the other."[5]
Perhaps the most hotly debated clause in each of the IADC Contracts
addressed choice of law:  "GOVERNING LAW:  This contract shall be
construed, governed, interpreted, enforced and litigated, and the
relations between the parties determined in accordance with the
laws of County of Cleveland, State of Oklahoma."[6]

---

[4]    See Memorandum Opinion dated April 22, 2010, Docket Entry No. 174,
pp. 1-7.  New factual material is cited to the current summary judgment evidence.

[5]    The Quicksilver Parties' Motion for Summary Judgment on Eagle's
Contract Claims ("The Quicksilver Parties' Motion"), Docket Entry No. 164,  Ex.
B, IADC Contracts, ¶ 27.27.

[6]    Id. at ¶ 18.

Five months after Quicksilver and Eagle entered the IADC Contracts, Blast Energy Services Inc. ("Blast") acquired Eagle Domestic Drilling Operations LLC ("EDDO"). In order to consummate the acquisition, Eagle and EDDO entered into an assignment agreement, facially effective August 25, 2006, that conveyed "all of [Eagle's] right title and interest to . . . the [IADC] Contracts[7] as of the date of the Assignment" to EDDO, as well as certain related assets incidental to the IADC Contracts.[8] The assignment agreement only excluded from transfer "accounts receivable, and all rights thereto, as of and through the Effective Date and all amounts received by [Eagle] under the terms of the [IADC] Contracts or as proceeds from [certain related assets] prior to or on the Effective Date."[9] In exchange for the assignment of the IADC Contracts, Eagle received a payment of $750,000 and indemnification rights.[10] Unlike the IADC Contracts, the assignment agreement states that it is governed by and construed under Texas law.[11]

Eagle notified Quicksilver about the assignment via e-mail

---

[7]     The assignment agreement also conveyed "right title and interest" in two other contracts, both of which Eagle had entered with Hallwood Petroleum LLC & Hallwood Energy LP. See id. at Ex. D, Assignment Agreement, Ex. B to the Assignment Agreement, Contracts Assigned.

[8]     Id. at recitals, ¶ 2.

[9]     Id. at ¶ 5.

[10]     See id. at recitals, ¶ 3, Ex. A to the Assignment Agreement, Indemnities.

[11]     Id. at ¶ 11.

four days after it was executed (three days after the effective date).[12]  The e-mail stated, "I wanted to let you know, Eagle sold rigs to Blast Energy out of Houston and has assigned the contracts to Blast."[13]   Although Quicksilver's executive vice president testified that, by August 30, 2006, Quicksilver had paid in full all of Eagle's invoices related to the IADC Contracts through the effective date of the assignment, Eagle's manager at the time, Rodney Thornton ("Thornton"), identified a number of invoices that were either not fully paid or were late.[14]

In a letter dated September 21, 2006, Quicksilver notified Blast that it was terminating the IADC Contract under which

---

[12]    See The Quicksilver Parties' Motion, Docket Entry No. 164, Ex. A, Affidavit of Cook, ¶ 3; Eagle's Response, Docket Entry No. 168, Ex. 2, Affidavit of Thornton, ¶ 20; Ex. 9, E-mail Message from Thornton to Cook dated Aug. 28, 2006.  Cook, Quicksilver's executive vice president, asseverated that Quicksilver received three notices of assignment dated August 25, 2006, stating that Eagle had "conveyed all of its right title and interest" in the IADC Contracts.  See The Quicksilver Parties' Motion, Docket Entry No. 164, Ex. A, Affidavit of Cook, ¶ 3; Ex. C, Notices of Assignment.  Eagle claims that the notices are forged and cites the affidavit testimony of Thornton.  Thornton's affidavit testimony that no notice of assignment dated August 25, 2006, was sent to Quicksilver and that the ones attached to Quicksilver's motion are forged directly contradicts his open court testimony before the District Court of Cleveland County, Oklahoma, in September 2009, where he authenticated a notice of assignment from Eagle to Quicksilver dated August 25, 2006.  Compare The Quicksilver Parties' Reply Brief in Support of their Motion for Summary Judgment on Eagle's Contract Claims ("The Quicksilver Parties' Reply"), Docket Entry No. 169, Ex. A, Eagle Drilling, LLC v. Quicksilver Resources, Inc., Case No. CJ-2007-1604 (Okla. Dist. Ct.--Cleveland Cnty. Sept. 14, 2009), Transcript of Proceedings on Sept. 14, 2009, pp. 359-60 with Eagle's Response, Docket Entry No. 168, Ex. 2, Affidavit of Thornton, ¶ 20.  Although troubling, Thornton's inconsistent testimony does not effect the decision of the court on the pending summary judgment motion because the date on which and the means by which Quicksilver received notice is immaterial to the issues at hand.

[13]    Eagle's Response, Docket Entry No. 168, Ex. 9, E-mail Message from Thornton to Cook date Aug. 28, 2006.

[14]    The Quicksilver Parties' Motion, Docket Entry No. 164, Ex. A, Affidavit of Cook, ¶ 4; Eagle's Response, Docket Entry No. 168, Ex. 2, Affidavit of Thornton, ¶¶ 10-14.

drilling operations had begun.[15]  Quicksilver brought suit in Texas state court in Tarrant County ("Tarrant County lawsuit") against EDDO and Eagle based on the allegation that the derrick on that rig did not comply with the specific requirements of the IADC Contract. Quicksilver brought contract and negligence claims.  Just over a week later, EDDO filed suit against Quicksilver in Oklahoma state court in Cleveland County ("Cleveland County lawsuit").

EDDO and Blast separately filed bankruptcy actions in the United States Bankruptcy Court for the Southern District of Texas ("Southern District Bankruptcy Court"), and the two cases were administratively consolidated.  EDDO dropped the Cleveland County lawsuit and brought those claims as an adversary proceeding in the Southern District Bankruptcy Court action.  Quicksilver responded by removing its Tarrant County lawsuit to the United States Bankruptcy Court for the Northern District of Texas.  From there, it was transferred to the Southern District Bankruptcy Court.

In September 2007, Eagle filed for bankruptcy in the United States Bankruptcy Court for the Western District of Oklahoma ("Western District Bankruptcy Court").  Quicksilver sought and received relief from the automatic stay in that proceeding in order to continue to prosecute this action.

The Southern District Bankruptcy Court ordered the parties to

---

[15]    The Quicksilver Parties' Motion, Docket Entry No. 164,   Ex. A, Affidavit of Cook, ¶ 3.

mediation, but it was unsuccessful.  In January 2008, Eagle filed a motion to withdraw the bankruptcy reference, and the court granted the motion.   In the meantime, the Southern District Bankruptcy Court approved EDDO's plan of reorganization, and, as of March 4, 2008, the plan had been substantially consummated.

In March 2008, the Southern District Bankruptcy Court recommended that this court withdraw the reference of the adversary proceeding.  Near the same time, Eagle initiated a lawsuit against Quicksilver concerning the IADC Contracts in the District Court of Cleveland County, Oklahoma.  Within a couple of weeks, Quicksilver removed the Oklahoma state court action to the Western District Bankruptcy Court, where it became part of Eagle's bankruptcy proceeding.  In May 2008, Eagle sought to have the Western District Bankruptcy Court either remand the action or abstain from hearing it.

That same month, this court granted Eagle's motion to withdraw reference, as recommended by the Southern District Bankruptcy Court.  In October 2008, Quicksilver and EDDO filed an agreed motion in this action to dismiss all of their claims and counterclaims against each other.  This court granted the motion. In September 2009, the United States District Court for the Western District of Oklahoma, after withdrawing reference to the Western District Bankruptcy Court, transferred the pending adversary proceeding to this court.

Late last year, the parties amended the pleadings. Of particular note here is Eagle's addition of claims against the individual defendants and allegations that Quicksilver breached the IADC Contracts and that Quicksilver, through the individual defendants and other employees or agents, breached the implied covenant of good faith and fair dealing within the IADC Contracts.

The breach of contract claim is based on a number of alleged violations:

    (1)  [Quicksilver] never provided the list of wells to be drilled;

    (2)  [Quicksilver] breached the implied covenant of good faith and fair dealing by:
        (a)  Lying about the commencement dates and the agreements of the parties,
        (b)  Lying about the depth to be drilled and about Eagle's responsibility to reach the depths which Quicksilver admitted it never gives a target depth to a drilling contractor;
        (c)  Lying about the ability of equipment and that it was in complete control of the drilling operations and the operation of the equipment at all times as per the IADC contracts;

    (3)  [Quicksilver failed] to pay all dayrate and demobilization costs, breached repair time obligations, reimbursable costs, and . . . further request[ed] that money be returned beyond the express dispute provisions of paragraph 5;

    (4)  [Quicksilver failed] to dispute timely the time of payment and dispute of invoices as specifically provided in the IADC contracts;

    (5)  [Quicksilver failed] to perform the terms of the contracts, the duration of the contract for Rig No. 16, early termination, and early termination compensation and as related to breaches of paragraphs 4 and 5;

(6)   [Quicksilver failed] to comply with environmental laws based upon its claims of leaks in pits and . . . fail[ed] to provide the proper mud program to avoid damage to the Rig No. 16 and . . . fail[ed] to provide proper notice of [its] required changes to the rig equipment to meet the drill string that Quicksilver provided;

(7)   [Quicksilver failed] to provide a sound location;

(8)   [Quicksilver failed] to pay Eagle for the damage it caused to Eagle's drilling equipment;

(9)   [Quicksilver failed] to provide insurance certificates as required;

(10)   [Quicksilver failed] to comply with the terms and provisions of paragraphs 14.5, 14.9, 14.11(b), 14.12, and 14.13 of the IADC contract related to Rig No. 16;

(11)   [Quicksilver failed] to litigate its disputes in Cleveland County, Oklahoma[,] as provided in paragraph 19 of the IADC contract and by filing lawsuits in courts other than courts in Cleveland County, Oklahoma;

(12)   [Quicksilver failed] to comply with the provisions of paragraphs 27.11, 27.14, 27.18, 27.19, 27.21, 27.26, 27.27, 27.29, 27.30, 27.31, 27.32, 27.33, 27.37; and[]

(13)   [Quicksilver failed] to provide the listing of well names and numbers to be drilled and further to provide Eagle with proper Kelly joints, subs, elevators, tongs, slips and BOP rams for use with special pipe as required by paragraph 6.1 of the IADC Contract pertaining to Rig No. 16.[16]

Eagle's bad faith breach of contract claim is based on allegations that Quicksilver's agents and employees breached the implied covenant of good faith and fair dealing by making false statements,

---

[16]   Eagle's First Amended Complaint, Docket Entry No. 149, pp. 19-20.

threatening and filing litigation in bad faith and in improper fora, and breaching the IADC Contracts for financial gain.[17]

In the course of this multifaceted litigation, several courts have issued opinions on a wide variety of identical or overlapping issues.  Now facing the court is the question whether Eagle's breach of contract and bad faith breach of contract claims are viable.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).

A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th

_____

[17]     See id. at pp. 21-22.

9

Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  <u>Anderson</u>, 477 U.S. at 250; <u>TIG Ins. Co. v. Sedgwick James of Wash.</u>, 276 F.3d 754, 759 (5th Cir. 2002).

### III.  Analysis

The Quicksilver parties argue that the court should enter judgment against Eagle on its contract claims because Eagle assigned away all of its rights, title, and interest in the IADC Contracts with the exception only of accounts receivable and amounts received by Eagle under those contracts through August 25, 2006.  Eagle responds that many of the alleged breaches occurred prior to the assignment and Eagle retained all rights to contract claims accruing prior to August 25, 2006.  Eagle also asserts that Quicksilver has not paid all of the invoices that were due to Eagle prior to the assignment.  In the alternative, should the court find the assignment transferred Eagle's rights to the contract claims, Eagle argues that the assignment is ambiguous.

As the Assignment Agreement contains an unambiguous choice-of-law provision, Texas law governs interpretation of the contract.[18]

---

[18]    In a prior opinion, the court stated, "Pursuant to the paragraph eighteen of the IADC Contracts, the parties have agreed to apply the substantive laws of Oklahoma to the present dispute."  Memorandum Opinion and Order, Docket Entry No. 44, p. 7, n.4.  Ignoring the court's obvious reference to and application of Oklahoma law to "the present dispute" involving interpretation of the assignment provisions of the IADC Contracts, Eagle has the audacity to argue against the application of Texas law to the interpretation of the Assignment Agreement.  "Although Quicksilver claims that Texas law governs the Assignment

Rules of contract interpretation are well settled in Texas.  <u>See</u> <u>Fed. Ins. Co. v. Srivastava</u>, 2 F.3d 98, 101 (5th Cir. 1993) (applying Texas law).

The terms of an agreement are to be given their plain grammatical meanings unless the instrument indicates that the terms have been used in some other sense.  <u>Fed. Ins. Co.</u>, 2 F.3d at 101; <u>DeWitt Cnty. Elec. Co-op., Inc. v. Parks</u>, 1 S.W.3d 96, 101 (Tex. 1999).  To the extent possible, all provisions within the contract are read together, and each is given effect so that no part of the agreement is left without meaning.  <u>Coker v. Coker</u>, 650 S.W.2d 391, 393 (Tex. 1983).

If the wording of a contract can be given a definite or certain legal meaning, it is unambiguous.  <u>Wal-Mart Stores, Inc. v. Sturges</u>, 52 S.W.3d 711, 728 (Tex. 2001); <u>DeWitt Cnty. Elec. Co-op., Inc.</u>, 1 S.W.3d at 100.  In such a case, the meaning imparted by the language used in the contract must be decided as a matter of law. <u>Gulf Ins. Co. v. Burns Motors, Inc.</u>, 22 S.W.3d 417, 423 (Tex. 2000); <u>DeWitt Cnty. Elec. Co-op., Inc.</u>, 1 S.W.3d at 100.  The court should not consider any extraneous evidence when interpreting an

---

and its construction, the Court has already held that Oklahoma law applies to and governs in this action."  Eagle's Response, Docket Entry No. 168, p. 14, n.2. Eagle continues its misrepresentation of the court's prior ruling by misidentifying the contract to which the court applied Oklahoma law in that opinion: "Moreover, this Court has already applied Oklahoma law when considering the Assignment and its construction and application."  <u>Id.</u>  As noted, the court applied Oklahoma law to the assignment provisions of the IADC Contracts, not to the Assignment Agreement.  In a separate case, the Southern District Bankruptcy Court found that the Assignment Agreement is subject to Texas law.  <u>See</u> <u>In re Blast Energy Servs., Inc.</u>, 396 B.R. 676, 704-05 (Bankr. S.D. Tex. 2008).

unambiguous contract.  See Estate of Martineau v. ARCO Chem. Co., 203 F.3d 904, 911 (5th Cir. 2000)(applying Texas law).

Only if the meaning is uncertain and doubtful or reasonably susceptible to more than one interpretation is the contract ambiguous.  DeWitt Cnty. Elec. Co-op., Inc., 1 S.W.3d at 100; Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996).  An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. Wal-Mart Stores, Inc., 52 S.W.3d at 728; DeWitt Cnty. Elec. Co-op., Inc., 1 S.W.3d at 100.  Instead, the court must determine whether a contract is susceptible to two or more reasonable interpretations based on the document as a whole in light of the circumstances surrounding its formation.  See Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc., 334 F.3d 423, 431 (5th Cir. 2003)(applying Texas law); DeWitt Cnty. Elec. Co-op., Inc., 1 S.W.3d at 100.

Concerning assignments in particular, all rights are transferred except those rights specifically retained.  See Hinton Prod. Co. v. Arcadia Exploration & Prod. Co., 261 S.W.3d 865, 870 (Tex. App.--Dallas 2008, no pet.).  "Unless limited by exceptions, reservations, conditions, or restrictions, an assignment generally carries with it all rights, remedies, and benefits incidental to the property assigned."  Id. (citing Cadle Co. v. Estate of Weaver, 897 S.W.2d 814, 818 (Tex. App.--Dallas 1994, writ denied)).

The court must determine what Eagle assigned to EDDO and what Eagle retained. To make this determination, the court turns to the Assignment Agreement, specifically its "Contract Assignment" and "Exclusions" provisions.

According to the specific terms of the agreement, Eagle "assign[ed] and convey[ed] all of its right title and interest to" the IADC Contracts and the "Other Assets."[19] The agreement defined "Other Assets" as "certain related assets incidental to the [IADC] Contracts as set forth in Exhibit C," which listed seven Chevrolet vehicles.[20] The "Exclusions" provision held back from the conveyance "accounts receivable, and all rights thereto" through the effective date and "all amounts received by the Assignor under the terms of the [IADC] Contracts or as proceeds from the Other Assets prior to or on" the effective date.[21] The Assignment Agreement explicitly set the effective date as August 25, 2006.[22]

The court finds no ambiguity in these provisions. Eagle

_____

[19]   The Quicksilver Parties' Motion, Docket Entry No. 164, Ex. D, Assignment Agreement, ¶ 2.

[20]   Id. at recitals, ¶ 2, Ex. C to Assignment Agreement, Other Assets.

[21]   Id. at ¶ 5.

[22]   Eagle argues that the assignment was not legally effective until Eagle provided Quicksilver with notice (which occurred three days after the effective date stated in the Assignment Agreement) because the IADC Contracts required written notice prior to assignment. In a prior opinion, the court addressed the effectiveness of the assignment, relying on legal authority stating that the failure to comply with contractual terms forbidding assignment does not render the assignment ineffective but, rather, gives rise to contract damages for breach of the assignment provisions in the contract. See Memorandum Opinion and Order, Docket Entry No. 44, p. 8. Based on that rationale, the assignment was effective on August 25, 2006, even though Eagle apparently breached the assignment provisions of the IADC Contracts by failing to provide prior notice.

13

assigned all of its rights, title, and interest[23] in the IADC Contracts and the seven listed Chevrolet vehicles except for the accounts receivable in existence on or before August 25, 2006, and all amounts received by Eagle under the IADC Contracts or as proceeds from the seven Chevrolet vehicles on or before August 25, 2006.[24]

The term "accounts receivable" is not specially defined in the agreement.  Therefore, the court defines it according to its plain meaning.  Looking to Texas law for guidance on the plain meaning, the court notes that the term is not defined in the Texas Business and Commerce Code, but "account" is defined as "a right to payment

---

[23]     Eagle argues that the missing comma(s) in the agreement's iteration, "right title and interest," reveals that the parties intended for Eagle to convey "correct, marketable, unclouded title to the trucks and other incidental equipment being assigned."  Eagle's Response, Docket Entry No. 168, p. 13.  This interpretation does not comport with the phraseology in the remainder of the "Contract Assignment" provision, not to mention industry usage, and makes no sense in the context of the entire contract.  More importantly, Eagle's interpretation is inconsistent with Eagle's previous representations and the court's prior rulings.  See, e.g., Quicksilver's Motion for Partial Summary Judgment as to Eagle's Counterclaim, Docket Entry No. 84, Ex. A-4, In re Blast Energy Servs., Inc., Adversary No. 07-03292 (Bankr. S.D. Tex. July 11, 2007), Eagle's Motion to Dismiss and Brief in Support or, in the Alternative, Motion to Sever Eagle, pp. 2, 6 ("On August 25, 2006, Eagle Drilling assigned all of its rights, title and interest in the IADC Contracts to EDDO")("With the assignment, all rights and liabilities in the IADC Contracts were transferred from Eagle Drilling to EDDO."); Eagle's Motion for Partial Summary Judgment on Quicksilver's Cause of Action for Breach of Contract, Docket Entry No. 85, p. 2 ("Since Rig Fourteen and Rig Fifteen were not scheduled for commencement until October 20, 2006 (Rig Fifteen) and January 20, 2007 (Rig Fourteen), all breach of contract claims asserted by Quicksilver could only occur after the August 25, 2006 assignment to EDDO of all of Eagle's obligations with regard to those IADC Contracts."); Memorandum Opinion and Order, Docket Entry No. 44, p. 2 ("On August 25, 2006, Eagle assigned all of its rights, title, and interest in the IADC Contracts to EDDO.").  Eagle's recent change of position does not present a reasonable interpretation of the Assignment Agreement.

[24]     Nothing in the Assignment Agreement can be reasonably construed as retaining to Eagle the right to pursue future litigation for breaches of contract occurring before or after the assignment.

payment of a monetary obligation," including, among other things, the right to payment for "property that has been sold, leased," etc., and for services rendered or to be rendered. Tex. Bus. & Comm. Code § 9.102(2). The definition now includes multiple other categories of monetary obligation, but it does not include causes of action. See Tex. Bus. & Comm. Code § 9.102(2); § 9.102 Uniform Commercial Code Comment 5.a. "[T]hings in action, other than accounts" fall within the statute's definition of "general intangible." See Tex. Bus. & Comm. Code § 9.102(43).

Based on the statutory definition, the court finds that causes of action are more properly classified as general intangibles. See In re Blast Energy Servs., Inc., 396 B.R. 676, 705-06 (Bankr. S.D. Tex. 2008). Eagle does not cite the court to any binding legal authority suggesting that a cause of action fits within the statutory or any other definition of account receivable.

In its live pleading, Eagle alleges that Quicksilver breached the IADC Contracts in a variety of ways; however, only a small fraction of the alleged breaches could even arguably be considered accounts receivable, as opposed to contract damages. Specifically, Eagle alleged that Quicksilver failed "to pay all dayrate and demobilization costs" and reimbursable costs.[25] Even if these three categories of money allegedly owed qualified as accounts receivable, the complaint is unclear whether these amounts were

---

[25]    Eagle's First Amended Complaint, Docket Entry No. 149, ¶ 51(3).

owed on or before the effective date of the assignment.  In fact, elsewhere in the complaint, Eagle concedes that, from the date of the delivery of Rig Sixteen going forward, "Quicksilver paid for [Eagle's] services in accordance with the [IADC] Contracts and [Eagle's] billing records as supplied to Quicksilver in June, July and through August 24, 2006."[26]

Eagle's summary judgment evidence of nonpayment for services rendered prior to the effective date of the assignment is not competent.  Eagle relies on Thornton's affidavit, in which he affirmed under oath that Quicksilver did not pay the Eagle invoices in full.[27]  Therein, Thornton testified that Quicksilver failed to pay in full invoices dated in June and July 2006 and submitted payments late for invoices dated in June, July, and August 2006 without including interest owed on the late payments.[28]  Per his affidavit, all of these invoices related to Rig Sixteen.[29]

Thornton's affidavit testimony directly contradicts his sworn testimony in a related suit.  In September 2009, before the District Court of Cleveland County, State of Oklahoma, Thornton testified under oath as follows:

Q    Now, from the date the IADC contracts were

---

[26]    Id. at ¶ 31.

[27]    See Eagle's Response, Docket Entry No. 168, Ex. 2, Affidavit of Thornton, ¶¶ 10-14.

[28]    See id.

[29]    See id.

originally entered until August 25th of 2006, Eagle
got paid what it was owed, didn't it?

A    Yes.

Q    In other words, all of Eagle's bills were paid by
Quicksilver?

A    Yes. Yes.[30]

Another portion of the hearing transcript contains this testimony

by Thornton:

Q    You've also testified, is it true, that Quicksilver
fully and timely paid Eagle for all amounts due
under the contract?

A    Yes.  To me, they did.  They paid timely.  Jeff
[Cook] was good about that.[31]

Although Thornton offered the above-quoted sworn testimony

before another court, the later submission of his affidavit that

directly contradicts the open court testimony in order to defeat

summary judgment is a classic example of a sham affidavit.  Where

a nonmovant offers a contradictory affidavit in order to

"manufacture a disputed material fact where none exists," the

general rule that a court is not at liberty to strike an affidavit

because it conflicts in some measure with a previous deposition is

no longer applicable.  Albertson v. T.J. Stevenson & Co., 749 F.2d

223, 228 (5th Cir. 1984).  The court **STRIKES** and does not consider

---

[30]    See The Quicksilver Parties' Reply, Docket Entry No. 169, Ex. A,
Eagle Drilling, LLC v. Quicksilver Resources, Inc., Case No. CJ-2007-1604 (Okla.
Dist. Ct.--Cleveland Cnty. Sept. 14, 2009), Transcript of Proceedings on Sept.
14, 2009, pp. 361-62.

[31]    Id. at p. 770.

17

paragraphs ten through fourteen of Thornton's affidavit because they directly contradict his prior sworn testimony without explanation and with the purpose of creating a fact issue where none existed regarding whether Quicksilver owed any accounts receivable to Eagle at the time of assignment of the IADC Contracts.

Absent Thornton's affidavit, Eagle has failed to produce any competent summary judgment evidence that any Quicksilver account receivable remains outstanding.[32] Because Eagle did not retain any other right to sue for breach of contract when assigning the IADC Contracts to EDDO, summary judgment should be entered in favor of the Quicksilver Parties on Eagle's breach of contract and bad faith breach of contract claims.[33]

It is with strained patience that the court now discusses Eagle's remaining, peripheral arguments. First, Eagle contends that paragraph 27.27, present in each of the IADC Contracts, "anticipates the continuing rights of Eagle in the IADC Contracts after any assignment."[34] Paragraph 27.27 allowed assignment by either party with prior written notice to the other and stated:

---

[32]   Eagle argues that fact issues exist as to whether Quicksilver breached the contract prior to the assignment. However, that is totally irrelevant because, even if there are such fact disputes, Eagle cannot pursue litigation if it did not retain that right.

[33]   The court also notes that the individuals mentioned in Eagle's bad faith breach of contract claim were not parties to the IADC Contracts and, therefore, are not proper parties to the breach of contract claims.

[34]   Eagle's Response, Docket Entry No. 168, p. 14.

18

In the event of such assignment by [Quicksilver], [Quicksilver] must remain liable to [Eagle] as guarantor of the performance by assignee of the terms of this contract.  If any assignment is made that materially alters [Eagle's] financial burden, [Eagle's] compensation shall be adjusted to give effect to any increase or decrease in [Eagle's] operating costs.[35]

Amazingly, Eagle posits that, by virtue of its own assignment of the IADC Contracts, "its operating costs of labor, insurance, and employees have been materially altered by Quicksilver."[36] Granted, this is a difficult argument to address, not because it has merit, but because it is so far afield.  Had Quicksilver made the assignment that increased Eagle's operating costs, Eagle would be in a position to seek adjustments for any increase (or decrease) in its operating costs in performing work under IADC Contracts.  As explained above, Eagle assigned all of its rights in the IADC Contracts (except accounts receivable and amounts received) to EDDO, which means it voluntarily assigned its rights under this provision as well.  Thus, EDDO, not Eagle, owned the right to enforce this provision.

Second, Eagle argues that Quicksilver terminated the IADC Contracts prior to the assignment and, therefore, owes Eagle early termination damages.  Rather than duplicate the thorough analysis of Southern District Bankruptcy Court on the identical argument, the court refers Eagle to In re Blast Energy Servs., Inc., 396 B.R.

---

[35]    The Quicksilver Parties' Motion, Docket Entry No. 164, Ex. B, IADC Contracts.

[36]    Eagle's Response, Docket Entry No. 168, p. 14.

at 704-07, which stated in part, "Even if the [IADC] Contracts terminated before August 25, 2006, the rights Eagle seeks to reserve pursuant to the Assignment—rights to recover for [the operator's] termination of the Contracts—are not accounts receivable; therefore, the claim is solely EDDO's property."  In that case, the court pointed out the absurdity of the exact argument made here by Eagle concerning the exact same Assignment Agreement, "In effect, Eagle's position necessarily leads to the conclusion that EDDO paid $750,000.00 for terminated contracts." Id. at 682 n.3.

Third, in a sur-reply filed in June, Eagle argued that "newly discovered evidence" showed that Quicksilver terminated the IADC Contracts prior to the assignment on August 25, 2006.[37]  Because the claim for early termination belonged to EDDO, the new evidence is immaterial.  Cf. Anderson, 477 U.S. at 248 (stating that material facts are those that are critical to the outcome of the suit).

Finally, Eagle contends that the Assignment Agreement contained a "No Third Party Benefit" provision that prevents Quicksilver from using the Assignment Agreement to its benefit. Eagle does not explain how Quicksilver is benefitting from the assignment agreement but insists that Quicksilver must look to the IADC Contracts and paragraph 27.27 for its rights with regard to

---

[37]   See Eagle's Sur-reply Brief to the Quicksilver Parties' Reply Brief in Support of their Motion for Summary Judgment, Docket Entry No. 210, p. 1.

the assignment.  Be that as it may, the issue is what rights Eagle retained after assignment, not rights redounding to Quicksilver. The court had to examine the Assignment Agreement in order to determine whether Eagle had the right to pursue litigation for the alleged breaches of the IADC contracts.  Because Eagle did not retain those rights, it is not entitled to maintain its breach of contract claims.

Eagle's reckless advocacy in connection with this motion is of great concern to the court.  Eagle has refused to accept prior rulings by this court and other clearly applicable judicial determinations.  Its supporting evidence contradicts, at least in part, prior sworn testimony it offered; many of its current arguments have been rejected previously in this case or under nearly identical circumstances; its brief is full of legal, factual, and record distortions; and its previously unaddressed arguments either contradict its prior positions and/or are so tenuous as to be nonsensical.  Eagle is warned that the court's patience with its unprofessional tactics has fully run.[38]

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that the Quicksilver parties' summary judgment motion be **GRANTED**.

---

[38]   The court notes that, on August 2, 2010, Eagle filed a Motion for Partial Summary Judgment on Quicksilver's Contract Claims and, on August 27, 2010, Eagle filed responses to motions filed by the Quicksilver parties.  If Eagle believes that any of its filings may run afoul of the court's admonition, it has five days to substitute its motion and/or responses.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. The original of any written objections shall be filed with the United States District Clerk electronically.

**SIGNED** in Houston, Texas, this 30th day of August, 2010.

Nancy K. Johnson
United States Magistrate Judge

22